# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) <br> ) <br> ) |
| v. | )    2:14-cr-00225 <br> ) |
| JERMAINE WILLIAMS, | )    Chief District Judge Mark R. Hornak <br> ) |
| Defendant. | ) |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Before the Court is Defendant Jermaine Williams's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) (ECF No. 197) ("Motion"). On September 28, 2015, Mr. Williams pleaded guilty to conspiracy to distribute one kilogram or more of heroin. (ECF No. 39.) On July 19, 2017, this Court sentenced Mr. Williams to 142 months in Bureau of Prisons ("BOP") custody, followed by 7 years of supervised release and payment of a mandatory special assessment of $100. (Original Judgment at ECF 143; Amended Judgment at ECF 184.)

On November 1, 2022, Mr. Williams filed his Motion to Reduce Sentence (ECF No. 197) in which he argued that his medical challenges, namely obesity, hypertension, and racial vulnerability, constituted "extraordinary and compelling reasons" for his release as required by the First Step Act. *See* § 3582(c)(1)(A)(i). Based on the record now before the Court as to Mr. Williams's Motion, which the Court has carefully considered and evaluated pursuant to its authority in such matters, the Court concludes that Mr. Williams has not demonstrated extraordinary and compelling reasons sufficient for this Court to reduce his sentence. Accordingly, for the reasons set out below, the Court concludes that Mr. Williams's situation does not support

1

granting the relief he seeks, and the Court therefore DENIES Mr. Williams's Motion to Reduce Sentence (ECF No. 197) without prejudice.

I.      **BACKGROUND**

On September 28, 2015, Mr. Williams pleaded guilty to conspiracy to distribute one kilogram or more of heroin. (ECF No. 39.) In the plea agreement, the parties stipulated that Mr. Williams distributed more than one, but not less than three, kilograms of heroin; had possessed a dangerous weapon during the commission of his offense; and was a manager or supervisor of criminal activity involving five or more participants. (ECF No. 207, at 3.) The parties stipulated that "[w]ith allowance for acceptance of responsibility, Williams's advisory sentencing guidelines called for a term of imprisonment of 121-151 months" and a mandatory minimum ten-year sentence. (*Id.*)

But while on release pending sentencing, Mr. Williams engaged in "illegal sales of Percocet tablets." (*Id.*) Due to this violation, he did not receive the three-level reduction for acceptance of responsibility under U.S.S.G. §§3E1.1(a) and (b)—causing his advisory sentencing guideline range to be 188-235 months. (*Id.*) On July 19, 2017, this Court sentenced Mr. Williams to 142 months in BOP custody, followed by 7 years of supervised release and payment of a mandatory special assessment of $100. (Original Judgment at ECF 143; Amended Judgment at ECF 184.) Mr. Williams is currently in BOP custody at Brooklyn MDC and his projected release date, taking into account the "good time" credits baked into the BOP's calculation of an anticipated release date, is June 4, 2025. *See Find an Inmate*, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Feb. 3, 2023).

Mr. Williams filed a motion to vacate his sentence under § 2255 on January 30, 2018. (ECF No. 157) and then voluntarily dismissed that motion on October 31, 2018 (ECF No. 173). On July

2

27, 2022, the Court granted Mr. William's motion to appoint counsel (ECF No. 187). (ECF No. 188.) Mr. Williams then filed the currently pending, counseled motion for compassionate release on November 1, 2022. (ECF No. 197.) Counsel for the Government filed a Response opposing this Motion on November 30, 2022. (ECF No. 207.) Mr. Williams filed a Reply on December 15, 2022 (ECF No. 210) and filed Supplemental Information on January 10, 2023 (ECF No. 211).

With the briefing complete, Mr. Williams's Motion to Reduce Sentence now ripe for resolution.

## II.     LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007); *see also Dillon v. United States*, 560 U.S. 817, 819 (2010) (citing 18 U.S.C. § 3582(c)). One such specific authorization is the First Step Act's amendment of 18 U.S.C. § 3582, also known as the compassionate release statute. As amended, that statute allows a court to reduce a defendant's term of imprisonment if "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1)(A)(i). In addition, the court must consider: (1) whether the defendant has exhausted the appropriate administrative remedies; (2) the factors set forth in 18 U.S.C. § 3553(a) to the extent that they apply; and (3) whether such a reduction is consistent with applicable U.S. Sentencing Commission policy statements. § 3582(c)(1)(A).

## III.    DISCUSSION

After analyzing the record, the Court concludes that Mr. Williams has not demonstrated extraordinary and compelling reasons for this Court to reduce his sentence. Specifically, while Mr. Williams's medical conditions, coupled with the COVID-19 conditions at MDC Brooklyn, are undoubtedly challenging circumstances, the Court concludes that Mr. Williams's unfounded

refusal to be vaccinated for COVID-19 significantly undermines Mr. Williams's claims as to and based on those medical challenges. The Court further concludes that consideration of the sentencing factors in 18 U.S.C. § 3553(a) also weighs against reducing Mr. Williams's sentence because of the seriousness of Mr. Williams's underlying offense and his repeated disregard for the law.

### A. Administrative Exhaustion

The Court first considers whether Mr. Williams has complied with § 3582(c)(1)(A)'s exhaustion requirement. Prior to petitioning a district court for relief under § 3582(c)(1)(A), a defendant must first file an administrative request for compassionate release or a sentence reduction with the warden of the facility where the defendant is incarcerated; the defendant must then either (1) "fully exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (2) wait 30 days from the date on which the defendant filed an administrative request with the warden. § 3582(c)(1)(A).

Either option for administrative exhaustion under § 3582(c)(1)(A), standing alone, is sufficient to satisfy the exhaustion requirement. *See United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020) (explaining that "the statute states that [a] defendant may file [a] motion [in the district court] thirty days after the warden receives his request" regardless of whether the warden has denied the request within those thirty days).

Administrative exhaustion is mandatory, and a court may not modify a sentence under § 3582(c)(1)(A) if exhaustion has not occurred, regardless of whether the Government contests the defendant's asserted exhaustion. *United States v. Davidson*, No. 16-139-2, 2020 WL 4877255, at *5 & n.4 (W.D. Pa. Aug. 20, 2020) (citing *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020)).

Upon the Court's independent consideration of whether administrative exhaustion has occurred, the Court concludes that Mr. Williams has, barely and by inference only, met the administrative exhaustion requirement as to his "medical conditions"—specifically, as to his obesity and hypertension—and as to the COVID-19 pandemic, but has not met the exhaustion requirement as to the "statistically demonstrated racial vulnerability" reasoning that he proffered in his Motion to the Court.

On August 22, 2022, Mr. Williams submitted a request for compassionate release to the BOP, stating that he is at an increased health risk if he contracts COVID-19 due to his medical conditions. (*See* ECF No. 197-1.) On September 22, 2022, the Warden denied his request. (*Id.*) Mr. Williams provided the BOP's denial of his request for compassionate release to the Court but did not provide a copy of the request he submitted to the BOP. (*Id.*) The Government has not provided that request to the Court, either, but it also does not challenge whether Mr. Williams as exhausted the relevant administrative prerequisites to filing his pending motion. Thus, the Court can only infer what Mr. Williams included in his request to the BOP based on the language in the BOP's denial. The denial letter states that Mr. Williams requested compassionate release on August 24, 2022, and, while it does not specifically identify which medical conditions Mr. Williams cited in his request, the letter states that Mr. Williams stated that he is "at increased risk if [he] contract[s] COVID-19 due to *medical conditions*." (*Id.* (emphasis added).) The question is thus whether this statement from Mr. Williams is sufficient to meet the requirement of administrative exhaustion and permit the Court to consider Mr. Williams's pending motion.

In *United States v. Davidson*, this Court analyzed the requirements under § 3582(c)(1)(A) as to the content of a defendant's administrative request to the BOP compared to the content of the defendant's motion to a court and the resulting scope of a court's review of the motion, including

5

"whether a defendant must specifically mention . . . in a BOP administrative request for compassionate release" each issue the defendant raises with the court before the court can consider those issues. *See* 2020 WL 4877255, at *7–13. The situation before the Court in *Davidson*, and the cases that the Court reviewed in its analysis there, involved a defendant seeking compassionate release in a request to the BOP based on one or more of the defendant's medical conditions and, in the motion to the court, relying upon those same medical conditions while also asserting for the first time that the COVID-19 pandemic constituted an extraordinary and compelling reason for compassionate release. *See id.* at *2–4, 8–13.

This Court in *Davidson* rejected the "'mirror image' approach" that some courts had taken to such motions that allows a court to "only consider the *exact information* that the defendant put before the BOP via their administrative request"; instead, the Court "agree[d] with the reasoning of [another] line of cases" that had concluded that a reference to COVID-19 made for the first time in the motion to the court "serves to supplement [] core concerns" related to medical issues and "is not an attempt to bring an entirely new request for compassionate release." *Id.* at *8, 14. As the Court noted in *Davidson*, the record revealed the BOP's multiple public statements of its considering the impact of the COVID-19 pandemic on the health and well-being of those in its custody, and the impact of the pandemic on BOP operations. *Id*. So long as the record before a court demonstrates that "the BOP [had] the first opportunity to consider" the primary grounds upon which a defendant relies in a compassionate release or sentence reduction motion to the court and that "such consideration in fact occurred by and within the BOP, the purposes of exhaustion have been fulfilled." *Id.* at *13.

Here, the Warden specifically referenced Mr. Williams' "medical conditions" in the denial of the submitted request for compassionate release. There appears to be no issue as between the

6

parties that Mr. Williams has advanced his obesity and alleged hypertension as medical conditions with which he is afflicted. It is thus apparently uncontested that such are "medical conditions" that Mr. Williams has relied upon, and in any event, they substantially relate to the core concerns that Mr. Williams expressed in terms of the risk of his of contracting COVID-19. Thus, from this less than robust record on this point, it would appear that the BOP would have had the first pass at considering all of Mr. Williams's medical conditions, including obesity and hypertension.

The same conclusion cannot be drawn for the "statistically demonstrated racial vulnerability" argument that Mr. Williams included in his Motion to the court. Racial vulnerability is not an independent medical condition and, thus, the BOP would not necessarily consider this when doing its review of Mr. Williams's request for compassionate release based on "medical conditions" that he claimed put him at a higher risk of contracting COVID-19. So, without a copy of the request he made to the BOP, the Court cannot conclude that this proffered extraordinary and compelling circumstance has been substantively exhausted.

In any event, even if racial vulnerability was administratively exhausted as a basis for the relief sought here, the Court does not find that as Mr. Williams articulates it, such could constitute an extraordinary and compelling circumstance warranting a reduction in sentence. As stated, it appears that Mr. Williams believes that he, personally, is more vulnerable to serious illness because of his race. But in doing so, he does not support that position by advancing record evidence that it is his race that factually causes such vulnerability, but instead relies on broader generalizations that as a matter of community health, due to a number of generalized factors, there is a difference in overall medical incidence and outcomes for those of his same race. Those are two fundamentally different principles, and the general does not necessarily lead to the specific, as Mr. Williams

appears to argue. Community morbidity data is simply not indicative of Mr. Williams' personal medical condition.

In sum, the Court concludes that Mr. Williams has modestly demonstrated administrative exhaustion as to his stated tangible medical conditions—specifically, as to his obesity and hypertension—and as to their involvement in the context of the COVID-19 pandemic but has not met the exhaustion requirement as to the "statistically demonstrated racial vulnerability" reasoning that he proffered in his Motion to the Court, a basis that the Court nonetheless finds unavailing in this context.

### B. "Extraordinary and Compelling Reasons"

Next, the Court must determine whether Mr. Williams's medical conditions, generally or specifically in light of the COVID-19 pandemic, constitute "extraordinary and compelling reasons" such that § 3582(c)(1)(A)(i) would permit this Court to release Mr. Williams from incarceration or reduce his sentence.

Section 3582 does not define the phrase "extraordinary and compelling reasons." *See* § 3582(c)(1)(A)(i). Instead, Congress delegated that task to the U.S. Sentencing Commission. *See* 28 U.S.C. § 994(t) (stating that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). The Sentencing Commission defined "extraordinary and compelling reasons" under the pre-First Step Act version of § 3582(c)(1)(A)(i) in a policy statement contained in § 1B1.13 of the U.S. Sentencing Guidelines Manual, relating to the BOP's discretion to reduce a prisoner's term of imprisonment. The Application Notes to § 1B1.13 of the Guidelines speak to conditions which would support compassionate release in the form of two different categories of medical conditions that can rise to an "extraordinary and compelling" level:

(1) terminal illnesses; and (2) non-terminal conditions that substantially diminish the ability of the defendant to provide self-care within the correctional environment.

The Sentencing Commission has not issued an updated policy statement since the First Step Act became law. *See United States v. Rodriguez*, 451 F. Supp. 3d 392, 396 (E.D. Pa. 2020). In *United States v. Andrews*, the Third Circuit explained that given the lack of an updated applicable Sentencing Commission policy statement defining "extraordinary and compelling reasons," "the existing policy statement is not applicable—and not binding—for courts considering prisoner-initiated motions" for compassionate release. 12 F.4th 255, 259 (3d Cir. 2021). However, "although the policy statement is no longer binding, it still sheds light on the meaning of extraordinary and compelling reasons." *Id.* at 260. This is because "Congress legislates against the backdrop of existing law," and thus, by "reenact[ing] the compassionate-release statute without any alterations to the phrase 'extraordinary and compelling reasons,'" Congress likely intended the phrase to retain the meaning that the Sentencing Commission gave it in its pre-First Step Act policy statement. *Id.* Therefore, in reviewing this Motion, this Court does not treat U.S.S.G. § 1B1.13 and the accompanying application notes as "an ultimate binding authority," but the Court nonetheless considers them as a guide in its analysis. *Id.* With these principles in mind, the Court turns to Mr. Williams's asserted extraordinary and compelling reasons for a sentence reduction.

### 1. **Medical Conditions**

First, the Court concludes that based on the record before it, Mr. Williams's individual medical conditions do not, standing alone nor in combination, constitute extraordinary and compelling reasons warranting a reduction in his sentence. Specifically, the Court concludes that the medical records indicate that Mr. Williams's history of purported hypertension is equivocal at

best, and although Mr. Williams's BMI is indisputably classified as obese, his refusal to be vaccinated for COVID-19 significantly undermines his claims about the challenges he faces due to his medical conditions and the COVID-19 pandemic.

### a. Obesity

Mr. Williams asserts that he is obese and is thus at an increased risk of experiencing more severe illness if he becomes infected with COVID-19. Mr. Williams's BMI is between 33 and 33.9, which is considered obese. (ECF No. 197, at 10.) Mr. Williams's highest recorded weight of 249 pounds on June 22, 2021, constitutes a BMI of 33.9, which is almost in the "severely obese" category. *See Defining Adult Overweight & Obesity*, Ctrs. for Disease Control & Prevention (last updated June 3, 2022) https://www.cdc.gov/obesity/basics/adult-defining.html. Mr. Williams provides research and citations to support the argument that people who are obese "are at increased risk of *severe* illness from the virus that causes COVID-19." (ECF No. 197, at 10.) According to the CDC, obesity can make it more likely that someone gets "very sick from COVID-19" and "[t]he risk of severe illness from COVID-19 increases sharply with higher BMI." *People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (last updated Jan. 26, 2023) https://bit.ly/3iZBI5M. The Government does not contest these facts in its Response. (ECF No. 207, at 4.)

Based on the record here, the Court concludes that Mr. Williams's obesity, standing alone, is not an extraordinary and compelling reason to modify his sentence. The Court recognizes that Mr. Williams's obesity is a risk factor that elevates the significance and seriousness of his medical situation as it relates to his COVID-19 risk. However, the Court also concludes that Mr. Williams has not established that his obesity has impacted his ability to perform self-care in a prison setting or has otherwise been a detriment to him aside from potentially causing him concern related to

COVID-19 and his overall health. Several courts in the Third Circuit have denied motions for compassionate release in which the defendant asserted that obesity, alone or in combination with other conditions, including hypertension, constituted extraordinary and compelling reasons for release or sentence reduction. *United States v. Dunich-Kolb*, No. 14-150, 2022 WL 580919, at *5 (D.N.J. Feb. 14, 2022) (citing cases). Here, while Mr. Williams is correct that he is obese by category, and that as a general matter, obesity can elevate the risk of serious illness from COVID-19, he has also not advanced any particularized connection between his obesity and those risks, beyond those that might be generally applicable.

### b. Hypertension

Mr. Williams next avers that he has high blood pressure, constituting hypertension. (ECF No. 197, at 14.) The Government argues that Mr. Williams's medical record do not support a diagnosis of hypertension, highlighting that that "his last documented reading occurred on November 2, 2022, and was 116/85, which is within the normal range." (ECF No. 207, at 4.) In his Reply to the Government, Mr. Williams states that the Government is failing to acknowledge his other blood pressure readings of 144/96, 137/97, and 141/89, which do constitute high blood pressure. (ECF No. 210, at 5.)

The Court recognizes that hypertension might put a person at a higher risk of contracting severe illness from the coronavirus. *See People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (last updated Jan. 26, 2023), https://bit.ly/3iZBI5M. However, the Court agrees with the Government that the medical records do not unequivocally show that Mr. Williams suffers from hypertension. Specifically, the Court finds it significant that Mr. Williams's more recent blood pressure result on November 2, 2022, was within a normal range and that Mr. Williams has not been prescribed medication for hypertension, nor any other treatment regimen

11

for high blood pressure. Thus, the Court concludes that Mr. Williams's claim of hypertension does not on this record constitute an extraordinary and compelling circumstance for purposes of this analysis.

### c. Other Medical Issues

In addition to obesity and hypertension, Mr. Williams further states that he suffers from "intermittent blood in his urine" and "unspecified chest pain." (ECF No. 197, at 20.) Mr. Williams does not otherwise set out the prognosis for or source/nature of these alleged afflictions, and their connection to the COVID-19 pandemic and any impact on him remains wholly undefined. On their own, Mr. Williams does not assert that these medical issues impede his ability for self-care and the Court does not conclude that these issues otherwise on their own or in combination are extraordinary and compelling circumstances warranting a reduction in sentence. The Court notes these issues, however, as part of Mr. Williams's full range of asserted medical challenges.

### 2. Statistically Demonstrated Racial Vulnerability

Mr. Williams argues that his racial vulnerability to contracting COVID-19 constitutes another extraordinary and compelling circumstance warranting a reduction in his sentence. Specifically, Williams avers that "[a]s an Africa American man, [he] is five times more likely to be infected than his fellow white inmates." (ECF No. 197, at 19.) To support this argument, Mr. Williams cites research indicating that "African Americans are infected by COVID-19 1.1 times more frequently; they require hospitalization 2.3 times more often if infected; and they suffer 1.7 times more deaths from COVID-19. (*Id.*)

In response, the Government argues that this is not a compelling and extraordinary basis for compassionate release because it "is distinctive from the medical COVID-19 risk factors because race only influences transmission' of the virus 'through intermediary factors like health

and social inequities." (ECF No. 207, at 4 (citing *U.S. v. Sidhu*, 2021 WL 2894723, at *6 (E.D. Va. July 9, 2021)).) The Government further argues that the research cited by Mr. Williams only pertains to "law-abiding" persons and because Mr. Williams is in prison "the socioeconomic factors upon which his claim is based simply do not apply to him." (*Id.* at 5 (citing *U.S. v. Jackson*, 2022 WL 1178513, at *3 (E.D. Va. Apr. 20, 2022)).) Mr. Williams replies to the Government's argument by asserting that "the fact that he is now in prison does not undercut the CDC statistics on race, since he has been subject to the same adverse socioeconomic factors, including health and access to healthcare, since birth." (ECF No. 210, at 7.)

As explained above, Court first concludes that this line of argument does not factor into its analysis because Mr. Williams has not demonstrated that this reason has been administratively exhausted. In any event, even if Mr. Williams exhausted this argument, the Court agrees with the Government that this is not an extraordinary and compelling circumstance as presented here. Specifically, the Court agrees that the sources cited by Mr. Williams indicate that any heightened susceptibility to COVID-19 or poorer outcomes from it for African Americans is attributable to socioeconomic and broadly based community factors that do not necessarily apply to Mr. Williams while he is in BOP custody. *See United States v. Joiner*, 988 F.3d 993, 996 (7th Cir. 2021); *United States v. Jackson*, 2022 WL 1178513, at *3 (E.D. Va. Apr. 20, 2022) (collecting cases). And critically, nothing in the record connects these broadly based statistical disparities across a community to Mr. Williams and his health situation as a specific person. He has not shown any medical basis to connect his race to a particularized harm or impact to or on him. Thus, the Court concludes that this is not a valid basis for reducing Mr. Williams's sentence.

3. **Dangerous Living Conditions in Custody**

When Mr. Williams first filed his Motion, he was incarcerated at FCI Coleman and argued in his Motion that conditions in that facility increased his risk of contracting COVID-19. (ECF No. 197, at 20.) Before the Government responded Mr. Williams was transferred to a different facility, thus the Government asserted that Mr. Williams's arguments on this point were moot. (ECF No. 207, at 4.)

In the Notice of Supplement Information that Mr. Williams filed on January 10, 2023, he noted that the facility where he is currently located, MDC Brooklyn, is operating at Pandemic Level 3 because it is "experiencing the highest community transmission and/or highest medical isolation rates." (ECF No. 211, at 1.) According to the BOP website, as of the date of this Opinion, Brooklyn MDC is Level 3 facility meaning that it has a medical isolation rate equal to or greater than 7% ; OR a Facility vaccination rate less than 50%; OR a Community transmission rate equal to or greater 200 per 100,000 over the last 7 days. *See COVID-19 Modified Operations Plan & Matrix*, Fed. BOP (last visited Feb. 3, 2023) https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp. Currently, 4 out of 97 facilities are Level 3. *See Operational Levels*, Fed. BOP (last visited Feb. 3, 2023) https://www.bop.gov/coronavirus/.

While the conditions at MDC Brooklyn indicate that there is a heightened risk for contracting COVID-19 in that facility, there are also significantly enhanced and amplified medical and other precautions in place while it is at Level 3. And for the reasons noted below, Mr. Williams has not taken the most basic step available to him in order to reduce his risk of serious illness if afflicted with COVID-19, namely getting vaccinated. Given all of these factors, the Court concludes that the conditions of MDC Brooklyn are not extraordinary and compelling on their own

to warrant a sentence reduction because Mr. Williams has not demonstrated how the facility's conditions specifically hinder Mr. Williams's ability to reasonably care for himself while in custody, nor do they on this record present an unacceptable risk of serious infection that is not being mitigated by the BOP, and which could be mitigated by Mr. Williams.

### 4. Vaccination Status

The Government argues that Mr. Williams's proffered circumstances cannot warrant a reduction in his sentence because he has "twice refused to be vaccinated against COVID-19." (ECF No. 207, at 5.) In his reply, Mr. Williams avers that "prisoners . . . have far more reason than others to be skeptical of the risks [of vaccines]." (*Id.* at 8–9.) He supports this skepticism by citing the fact that "[o]nly 47% of inmates at MDC Brooklyn are vaccinated" and "correctional staff have refused the vaccine in large numbers." (*Id.* at 9.) Mr. Williams also states that inmates have "little access to any outside medical literature or other resources to make an informed opinion on the merits and risks of the vaccine." (*Id.* at 10.) In all, Mr. Williams supports his refusal of the vaccine with the argument that "[m]any inmates are skeptical of the vaccines and, without proper education and discussion, that skepticism has led to a good faith refusal on the part of many inmates to accept vaccination." (*Id.* at 12.)

The Court concludes that Mr. Williams's refusal to get vaccinated is not conclusively dispositive, but it surely does substantially undercut his claim of extraordinary and compelling medical circumstances. As the Third Circuit has recognized, "District courts routinely deny compassionate release to inmates who refuse the COVID-19 vaccine because they have voluntarily failed to mitigate the very health concerns they identify in support of an early release." *United States v. Thomas*, 2022 WL 296594, at *2 (3d Cir. Feb. 1, 2022).

15

Here, Mr. Williams does not provide a potentially compelling reason for his decision to refuse the vaccine, such as an allergy or a religious purpose. Rather Mr. Williams asserts that he refused to receive the vaccine because of a general skepticism about the vaccine and supports this skepticism by arguing that such skepticism is widespread among inmates due to a lack of access to "medical literature" or "informed opinions." From the Court's perspective, this line of argument is not persuasive. Specifically, while the Court acknowledges that general mistrust in or weariness of vaccinations is a viewpoint that exists in some segments of society, it does not find that viewpoint to be a valid justification to decline vaccination, especially when 81% of Americans have received at least one dose of a COVID-19 vaccination to date. *See COVID Data Tracker*, Ctrs. for Disease Control & Prevention, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-people-booster-percent-total (last updated Feb. 2, 2023). Further, Mr. Williams' contention that he has access to limited information does not ring true. If he cannot gather information from resources in the prison setting, he does have appointed counsel, who could serve as a resource for him. The record does not reveal that such avenues are unavailing.

Moreover, the Court concludes that Mr. Williams's decision to refuse the vaccine undermines Mr. Williams's argument that he in the midst of extraordinary and compelling medical circumstances. In the Court's view, based on the record before it and medical literature as now developed, receiving a vaccine would substantially mitigate Mr. Williams's susceptibility for contacting COVID-19 and his risk of developing severe symptoms if he were to contact the virus. *See COVID-19 Vaccine Effectiveness Monthly Update*, Ctrs. for Disease Control & Prevention, https://covid.cdc.gov/covid-data-tracker/#vaccine-effectiveness (last updated Nov. 10, 2022). Thus, by refusing to receive the vaccine, Mr. Williams is voluntarily failing to take reasonable steps to mitigate the risks that he asserts are extraordinary and compelling circumstances, without

16

presenting any adequate basis for doing so, beyond his personal skepticism of vaccines, which says is joined in by that of some others. That simply is not sufficient.

In all, the Court recognizes that Mr. Williams faces challenges—including obesity, past high blood pressure that could potentially constitute hypertension, and a somewhat heightened risk at a BOP Level 3 Facility—however, the Court ultimately concludes these challenges, when considered in conjunction with each other and with the fact that Mr. Williams has refused to be vaccinated for COVID-19 without a substantial reason beyond his personal skepticism and what he asserts is the collective skepticism of those around him, do not constitute extraordinary and compelling circumstances such that § 3582(c)(1)(A)(i) would direct this Court to release Mr. Williams from incarceration or reduce his sentence.

### C. The § 3553(a) Sentencing Factors

If the Court had concluded that there were extraordinary and compelling circumstances warranting relief here, the Court would then need to consider the sentencing factors set forth in 18 U.S.C. § 3553(a) as it is required to do under § 3582(c)(1)(A).

The determination of "whether to reduce an eligible defendant's term of incarceration for compassionate release after considering the § 3553(a) factors is committed to the discretion of the [district court]." *United States v. Jones*, No. 12-000038, 2020 WL 3871084, at *4 (W.D. Pa. July 8, 2020) (citing *United States v. Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020)). That discretion includes the district court's authority to consider the length of the defendant's original custodial sentence, including the portions served and remaining, when weighing the § 3553(a) factors. *Pawlowski*, 967 F.3d at 330–31. The overarching question the Court must answer is whether a "point [has] been reached that the purposes of sentencing can and will be fulfilled with a modified sentence that does not include further BOP custody" in some form. *See, e.g.*, *Skrine*, 2021 WL

71233, at *5. (c)(1)(A). "In considering the section 3553(a) factors, [the Court] should assess whether those factors outweigh [any] 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence." *United States v. Bess*, 455 F. Supp. 3d 53, 66 (W.D.N.Y. Apr. 22, 2020) (citation omitted).

Here, Mr. Williams argues the relevant § 3553(a) factors support his motion for compassionate release first because his underlying offense was nonviolent and "that his adult criminal history includes no violent offenses" even though he "was routinely exposed to violence and crime at a young age." (ECF No. 197, at 24.) Mr. Williams then argues that he has been "gainfully employed at his institution and provided exemplary work in landscaping and as a unity orderly." (*Id.* at 25.) Finally, Mr. Williams highlights his release plan and asserts that he will be remain on supervised release. (*Id.* at 29.)

The Government argues that "[t]he serious nature of Williams's criminal conduct does not warrant his compassionate release." (ECF No. 207, at 6.) The Government emphasizes that Williams distributed heroin, "an insidious and dangerous controlled substance," and that "Williams . . . occupied a supervisor role within the distribution network and possessed a firearm in connection with the offense of conviction." (*Id.*) Further the Government highlights that Mr. Williams "illegally distributed drugs and physically assaulted his former girlfriend while he was under the Court's supervision"—referring to when he was on bond in 2016. (*Id.*) The Government avers that this history "casts doubt on his ability to comply with conditions of supervised release if his motion is granted." (*Id.*)

The Court agrees with the Government on these points. Specifically, the Court finds it significant that Mr. Williams did not receive a three-level reduction for acceptance of

responsibility during his sentencing because he engaged in illegal sales of Percocet tablets while awaiting sentencing. The sentence imposed on Mr. Williams at the time of his sentencing accounted for this wrongdoing and the Court concludes that reducing Mr. Williams sentence now would undermine one of the purposes of his original sentence. Namely, in the Court's view, a reduction would undermine the deterrence to criminal conduct created by the original sentence and would put the community at risk of future crimes committed by Mr. Williams.

The Court also concludes that the seriousness of Mr. Williams's underlying crime weighs against reducing Mr. Williams's sentence. Based on the plea agreement, Mr. Williams was personally higher up (either a manager or supervisor) in a conspiracy to distribute more than one kilogram of heroin and possessed a dangerous weapon in the commission of his offense. The Court concludes that a reduction in Mr. Williams's original sentence would undermine the reflection of the severity of Mr. Williams's criminal activity. Thus, even if the Court had determined that Mr. Williams demonstrated extraordinary and compelling circumstances, the Court would find that a reduction in sentence is not warranted in light of the § 3553(a) factors.

## IV. CONCLUSION

The Court has carefully considered the parties' extensive briefing on Mr. Williams's Motion to Reduce Sentence and whether such briefing demonstrates extraordinary and compelling reasons for Mr. Williams's release. Having done so, the Court concludes that Mr. Williams has not demonstrated that such reasons exist, and, even if he had shown such circumstances to exist, the Court also concludes that reducing his sentence would not be appropriate in light of the sentencing factors articulated in 18 U.S.C. § 3553(a).

Accordingly, Mr. Williams's Motion to Reduce Sentence Pursuant to Section 404 of the First Step Act (ECF No. 197) is DENIED without prejudice to its reassertion should the law and circumstances warrant.

An appropriate Order will issue.

s/ Mark R. Hornak<br>
Mark R. Hornak<br>
Chief United States District Judge

Dated:		February 3, 2023
cc:		All counsel of record